# UNITED STATES DISTRICT COURT

for the
Central District of California

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) |
| | ) Case No. 2:21-mj-5641 |
| Person To Be Searched: | ) |
| The person of ANGEL EDUARDO PADRON, | ) |
| (date of birth 01/03/1997), | ) |
| | ) |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A-2*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B-2*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2422(b) | Coercion and Enticement of a Minor |
| 18 U.S.C. § 2251(a), (e) | Production of Child Pornography |
| 18 U.S.C. § 2252A(a)(2) | Receipt and Distribution of Child Pornography |
| 18 U.S.C. § 2252A(a)(5)(B) | Possession of Child Pornography |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days*: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

NATHANIEL HINES
_____
*Applicant's signature*

Nathaniel Hines, Special Agent FBI
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____

_____
*Judge's signature*

City and state: Los Angeles, CA

Honorable Louise A. LaMothe
_____
*Printed name and title*

AUSA: Bruce Riordan (213-894-0480)

## **ATTACHMENT A-2**

PERSON TO BE SEARCHED

    The person of ANGEL EDUARDO PADRON, (date of birth 01/03/1997), and any property, including digital devices, on his person, including but not limited to, any pockets in his clothing, and in any bags or other containers carried or held by him or within his reach, provided that ANGEL EDUARDO PADRON is located within the Central District of California at the time of the search.

**ATTACHMENT B-2**

**ITEMS TO BE SEIZED**

4.    The items to be seized are evidence, contraband,
fruits, or instrumentalities of violations of 18 U.S.C. §§
2422(b) (Coercion and Enticement of a Minor); 2251(a), (e)
(Production of Child Pornography); 2252A(a)(2) (Receipt and
Distribution of Child Pornography); and 2252A(a)(5)(B)
(Possession of Child Pornography) (collectively, the "SUBJECT
OFFENSES") (the "Subject Offenses"), namely:

          a.    Child pornography, as defined in 18 U.S.C.
§ 2256(8).

          b.    Any records, documents, programs, applications,
or materials, including electronic mail and electronic messages,
that refer to child pornography, as defined in 18 U.S.C.
§ 2256(8), including but not limited to documents that refer to
the possession, receipt, distribution, transmission,
reproduction, viewing, sharing, purchase, or downloading,
production, shipment, order, requesting, trade, or transaction
of any kind, involving child pornography.

          c.    Any records, documents, programs, applications,
or materials, including electronic mail and electronic messages,
and also including but not limited to financial records, tending
to identify persons involved in the possession, receipt,
distribution, transmission, reproduction, viewing, sharing,
purchase, or downloading, production, shipment, order,
requesting, trade, or transaction of any kind, involving child
pornography, as defined in 18 U.S.C. § 2256.

d.   Any records, documents, programs, applications,
or materials, including electronic mail and electronic messages,
that refer or relate to any production, receipt, shipment,
order, request, trade, purchase, or transaction of any kind
involving the transmission through interstate commerce by any
means, including by computer, of any visual depiction of a minor
engaged in sexually explicit conduct, as defined in 18 U.S.C.
§ 2256.

e.   Any records, documents, programs, applications,
or materials, including electronic mail and electronic messages,
identifying persons transmitting in interstate commerce,
including by computer, any visual depiction of a minor engaged
in sexually explicit conduct, as defined in 18 U.S.C. § 2256.

f.   Any records, documents, programs, applications,
or materials, including electronic mail and electronic messages,
that identify any minor visually depicted while engaging in
sexually explicit conduct, as defined in 18 U.S.C. § 2256.

g.   Any and all records, documents, programs,
applications, or materials or items which are sexually arousing
to individuals who are interested in minors, but which are not
in and of themselves obscene or which do not necessarily depict
minors involved in sexually explicit conduct.  Such material is
commonly known as "child erotica" and includes written materials
dealing with child development, sex education, child
pornography, sexual abuse of children, incest, child
prostitution, missing children, investigative techniques of

child exploitation, sexual disorders, pedophilia, nudist publications, diaries, and fantasy writings.

  h. Any records, documents, programs, applications, or materials identifying possible minor victims depicted in child pornography and/or minor victims of sexual abuse.

  i. Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, which pertain to peer-to-peer file sharing software.

  j. Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, which pertain to accounts with any Internet Service Provider.

  k. Any records, documents, programs, applications, materials, and files relating to IP address 70.93.173.48.

  l. Records, documents, programs, applications, materials, and files relating to the deletion, uploading, and/or acquisition of victim files to include photographs, videos, e-mails, chat logs, or other files.

  m. Any digital device used to facilitate the above-listed violations and forensic copies thereof.

  n. Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

  o. With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

   i. evidence of who used, owned, or controlled the device at the time the things described in this warrant were

xv

created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.  evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

iv.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v.   evidence of the times the device was used;

vi.  passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

viii.    records of or information about Internet Protocol addresses used by the device;

ix.  records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages,

search terms that the user entered into any Internet search
engine, and records of user-typed web addresses.

5.   As used herein, the terms "records," "documents,"
"programs," "applications," and "materials" include records,
documents, programs, applications, and materials created,
modified, or stored in any form, including in digital form on
any digital device and any forensic copies thereof.

6.   As used herein, the term "digital device" includes any
electronic system or device capable of storing or processing
data in digital form, including central processing units;
desktop, laptop, notebook, and tablet computers; personal
digital assistants; wireless communication devices, such as
telephone paging devices, beepers, mobile telephones, and smart
phones; digital cameras; gaming consoles (including Sony
PlayStations and Microsoft Xboxes); peripheral input/output
devices, such as keyboards, printers, scanners, plotters,
monitors, and drives intended for removable media; related
communications devices, such as modems, routers, cables, and
connections; storage media, such as hard disk drives, floppy
disks, memory cards, optical disks, and magnetic tapes used to
store digital data (excluding analog tapes such as VHS); and
security devices.

**SEARCH PROCEDURE FOR DIGITAL DEVICES**

11.   In searching digital devices or forensic copies
thereof, law enforcement personnel executing this search warrant
will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii.   The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool

Kit), which tools may use hashing and other sophisticated techniques, including to search for known images of child pornography.

iv.   The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

c.   If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

d.   If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

e.   If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

f.   The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been

able to fully search a device because the device or files contained therein is/are encrypted.

g.   After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

12.   In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.   Any digital device capable of being used to commit, further, or store evidence of the offenses listed above;

b.   Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.   Any magnetic, electronic, or optical storage device capable of storing digital data;

d.   Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.   Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.   Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.   Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

h.   After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

13.   During the execution of this search warrant, with respect to ANGEL PADRON, who is located at the SUBJECT PREMISES during the execution of the search and who is reasonably believed by law enforcement to be a user of a biometric sensor-enabled device that falls within the scope of the warrant, law enforcement personnel are authorized to: (1) depress the thumb-and/or fingerprints of the person onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of the face of the person with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

14.   The special procedures relating to digital devices found in this warrant govern only the search of digital devices

pursuant to the authority conferred by this warrant and do not
apply to any search of digital devices pursuant to any other
court order.

**AFFIDAVIT**

I, Nathaniel Hines, being duly sworn, declare and state as follows:

## I.  INTRODUCTION

1.    I am a Special Agent ("SA") with the FBI, and have been so employed since May 2015.

## II. PURPOSE OF AFFIDAVIT

2.    This affidavit is made in support of an application for a warrant to search:

    a.    The premises located at 12 N Alisos St., Santa Barbara, CA 93103-3413, as further described in Attachment A-1, and

    b.    The person of ANGEL PADRON, aka "Daniel," as further described in Attachment A-2.

    c.    The requested warrant seeks authorization to seize evidence, fruits, and instrumentalities, of violations of 18 U.S.C. §§ 2422(b) (Coercion and Enticement of a Minor); 2251(a), (e) (Production of Child Pornography); 2252A(a)(2) (Receipt and Distribution of Child Pornography); and 2252A(a)(5)(B) (Possession of Child Pornography) (collectively, the "SUBJECT OFFENSES"), as described further in Attachments B-1 and B-2.  Attachments A-1, A-2, B-1, and B-2 are incorporated herein by reference.

3.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there

is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### III. BACKGROUND OF SPECIAL AGENT RODNEY HYRE

4.    I am a Special Agent with the Federal Bureau of Investigation ("FBI"), assigned to the Ventura Resident Agency of the Los Angeles Field Office in the Central District of California.  I have been employed by the FBI since May 2015. Previous to my employment with the FBI, I obtained a Bachelor of Science in Aerospace Engineering, a Master of Science in Interdisciplinary Engineering, and a certificate in Global Management, and was employed in the Aerospace Defense Industry for approximately eleven years.  During my tenure as a Special Agent, I have received training regarding computer technology crimes and child sexual exploitation crimes, and have conducted and participated in numerous investigations of criminal activity.  During these investigations, I have executed and participated in the execution of numerous search and arrest warrants and seized evidence of violations of United States law. I have conducted investigations into computer intrusions, internet enabled financial fraud, and child exploitation and child pornography.

## IV. <u>BACKGROUND ON CHILD EXPLOITATION OFFENSES, COMPUTERS, THE INTERNET, AND DEFINITION OF TERMS</u>

5.    In this affidavit, the terms "minor," "sexually explicit conduct," "visual depiction," "producing," and "child pornography" are defined as set forth in 18 U.S.C. § 2256.  The term "computer" is defined as set forth in 18 U.S.C. § 1030(e)(1).

6.    Based upon my training and experience in the investigation of child pornography, and information related to me by other law enforcement officers involved in the investigation of child pornography, I know the following information about the use of computers with child pornography:

        a.   <u>Computers and Child Pornography</u>.  Computers and computer technology have revolutionized the way in which child pornography is produced, distributed, and utilized.  Child pornographers can now produce both still and moving images directly from a common video camera and can convert these images into computer-readable formats.  The use of digital technology has enabled child pornographers to electronically receive, distribute, and possess large numbers of child exploitation images and videos with other Internet users worldwide.

        b.   <u>File Storage</u>.  Computer users can choose their method of storing files: either on a computer's hard drive, an external hard drive, a memory card, a USB thumb drive, a smart phone or other digital media device, etc. (i.e., "locally") or on virtual servers accessible from any digital device with an Internet connection (i.e., "cloud storage").  Computer users

3

frequently transfer files from one location to another, such as
from a phone to a computer or from cloud storage to an external
hard drive.  Computer users also often create "backup," or
duplicate, copies of their files.  In this way, digital child
pornography is extremely mobile and such digital files are
easily reproduced and transported.  For example, with the click
of a button, images and videos containing child pornography can
be put onto external hard drives small enough to fit onto a
keychain.  Just as easily, these files can be copied onto
compact disks and/or stored on mobile digital devices, such as
smart phones and tablets.  Furthermore, even if the actual child
pornography files are stored on a "cloud," files stored in this
manner can only be accessed via a digital device.  Therefore,
viewing this child pornography would require a computer,
smartphone, tablet, or some other digital device that allows the
user to access and view files on the Internet.

        c.    Internet.  The term "Internet" is defined as the
worldwide network of computers -- a noncommercial, self-
governing network devoted mostly to communication and research
with roughly 500 million users worldwide.  The Internet is not
an online service and has no real central hub.  It is a
collection of tens of thousands of computer networks, online
services, and single user components.  In order to access the
Internet, an individual computer user must use an access
provider, such as a university, employer, or commercial Internet
Service Provider ("ISP"), which operates a host computer with
direct access to the Internet.

4

      d.   <u>Internet Service Providers</u>.  Individuals and businesses obtain access to the Internet through ISPs.  ISPs provide their customers with access to the Internet using telephone or other telecommunications lines; provide Internet e-mail accounts that allow users to communicate with other Internet users by sending and receiving electronic messages through the ISPs' servers; remotely store electronic files on their customer's behalf; and may provide other services unique to each particular ISP.  ISPs maintain records pertaining to the individuals or businesses that have subscriber accounts with them.  Those records often include identifying and billing information, account access information in the form of log files, e-mail transaction information, posting information, account application information, and other information both in computer data and written record format.

      e.   <u>IP Addresses</u>.  An Internet Protocol address ("IP Address") is a unique numeric address used to connect to the Internet.  An IPv4 IP Address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  In simple terms, one computer in a home may connect directly to the Internet with an IP Address assigned by an ISP.  What is now more typical is that one home may connect to the Internet using multiple digital devices simultaneously, including laptops, tablets, smart phones, smart televisions, and gaming systems, by way of example.  Because the home subscriber typically only has one Internet connection and is only assigned one IP Address at a time by their ISP, multiple devices in a home are connected to

the Internet via a router or hub.  Internet activity from every
device attached to the router or hub is utilizing the same
external IP Address assigned by the ISP.  The router or hub
"routes" Internet traffic so that it reaches the proper device.
Most ISPs control a range of IP Addresses.  The IP Address for a
user may be relatively static, meaning it is assigned to the
same subscriber for long periods of time, or dynamic, meaning
that the IP Address is only assigned for the duration of that
online session.  Most ISPs maintain records of which subscriber
was assigned which IP Address during an online session.

      f.  <u>IP Address – IPv6</u>.  Due to the limited number of
available IPv4 IP addresses, a new protocol was established
using the hexadecimal system to increase the number of unique IP
addresses.  An IPv6 consists of eight sets of combination of
four numbers 0-9 and/or letters A through F.  An example of an
IPv6 IP address is 2001:0db8:0000:0000:0000:ff00:0042:8329.

      g.  The following definitions:

        i.  "Chat," as used herein, refers to any kind
of text communication over the Internet that is transmitted in
real-time from sender to receiver. Chat messages are generally
short in order to enable other participants to respond quickly
and in a format that resembles an oral conversation. This
feature distinguishes chatting from other text-based online
communications such as Internet forums and email.

        ii.  "Chat room," as used herein, refers to the
ability of individuals to meet in one location on the Internet
in order to communicate electronically in real-time to other

individuals. Individuals may also have the ability to transmit links to electronic files to other individuals within the chat room.

iii. "Child erotica," as used herein, means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not necessarily obscene or do not necessarily depict minors engaging in sexually explicit conduct.

iv. "Child pornography," as defined in 18 U.S.C. § 2256(8), is any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical or other means, of sexually explicit conduct, where: (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct; (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct; or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct.

v. "Cloud-based storage," as used herein, is a form of digital data storage in which the digital data is stored on remote servers hosted by a third party (as opposed to, for example, on a user's computer or other local storage device) and is made available to users over a network, typically the Internet. Users of such a service can share links and associated passwords to their stored files with other traders of child

pornography in order to grant access to their collections. Such services allow individuals to easily access these files through a wide variety of electronic devices such as desktop and laptop computers, mobile phones, and tablets, anywhere and at any time. An individual with the password to a file stored on a cloud-based service does not need to be a user of the service to access the file. Access is typically free and readily available to anyone who has an Internet connection.

vi.  "Computer," as used herein, refers to "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device" and includes smartphones, other mobile phones, and other mobile devices. *See* 18 U.S.C. § 1030(e)(1).

vii. "Computer hardware," as used herein, consists of all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, "thumb," "jump," or "flash" drives, which are small devices that are plugged into a port on the computer, and other memory storage devices); peripheral input/output devices (including keyboards, printers, video display monitors, and related

communications devices such as cables and connections); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including physical keys and locks).

        viii.    "Computer software," as used herein, is digital information which can be interpreted by a computer and any of its related components to direct the way they work. Computer software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

        ix.  "Computer passwords and data security devices," as used herein, consist of information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates what might be termed a digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it.

        x.  "File Transfer Protocol" ("FTP"), as used herein, is a standard network protocol used to transfer computer files from one host to another over a computer network, such as

the Internet. FTP is built on client-server architecture and uses separate control and data connections between the client and the server.

xi.  "Encryption" is the process of converting data into a code in order to prevent unauthorized access to the data.

xii. The "Internet" is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

xiii.    "Internet Service Providers" ("ISPs"), as used herein, are commercial organizations that are in business to provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers including access to the Internet, web hosting, email, remote storage, and co-location of computers and other communications equipment.

xiv. An "Internet Protocol address" or "IP address," as used herein, refers to a unique numeric or alphanumeric string used by a computer or other digital device to access the Internet. Every computer or device accessing the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer or device may be directed properly from its source to its destination. Most Internet Service Providers ("ISPs") control a range of IP

10

addresses. IP addresses can be "dynamic," meaning that the ISP assigns a different unique number to a computer or device every time it accesses the Internet. IP addresses might also be "static," if an ISP assigns a user's computer a particular IP address that is used each time the computer accesses the Internet. ISPs typically maintain logs of the subscribers to whom IP addresses are assigned on particular dates and times.

xv.  "Log files" are records automatically produced by computer programs to document electronic events that occur on computers. Computer programs can record a wide range of events including remote access, file transfers, logon/logoff times, and system errors. Logs are often named based on the types of information they contain. For example, web logs contain specific information about when a website was accessed by remote computers; access logs list specific information about when a computer was accessed from a remote location; and file transfer logs list detailed information concerning files that are remotely transferred.

xvi. "Minor," as defined in 18 U.S.C. § 2256(1), refers to any person under the age of eighteen years.

xvii.    "Mobile applications," as used herein, are small, specialized programs downloaded onto mobile devices that enable users to perform a variety of functions, including engaging in online chat, reading a book, or playing a.

xviii.    "Records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in

11

handmade, photographic, mechanical, electrical, electronic, or magnetic form.

xix. "Remote computing service," as defined in 18 U.S.C. § 2711(2), is the provision to the public of computer storage or processing services by means of an electronic communications system.

xx.  "Sexually explicit conduct," as defined in 18 U.S.C. § 2256(2), means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the anus, genitals, or pubic area of any person.

xxi. A "storage medium" or "storage device" is any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, "thumb," "jump," or "flash" drives, CD-ROMs, and other magnetic or optical media.

xxii.   "Visual depiction," as defined in 18 U.S.C. § 2256(5), includes undeveloped film and videotape, data stored on computer disc or other electronic means which is capable of conversion into a visual image, and data which is capable of conversion into a visual image that has been transmitted by any means, whether or not stored in a permanent format.

xxiii.   A "Website" consists of textual pages of information and associated graphic images. The textual information is stored in a specific format known as Hyper-Text

Mark-up Language (HTML) and is transmitted from web servers to various web clients via Hyper-Text Transport Protocol (HTTP).

## V. TRAINING & EXPERIENCE ON INDIVIDUALS WITH A SEXUAL INTEREST IN CHILDREN

7.    Based on my training and experience, and the training and experience of other law enforcement officers with whom I have had discussions, I have learned that individuals who view and possess multiple images of child pornography are often individuals who have a sexual interest in children and in images of children, and that there are certain characteristics common to such individuals:

a.    Individuals who have a sexual interest in children or images of children may receive sexual gratification, stimulation, and satisfaction from contact with children; or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or in other visual media, or from literature describing such activity.  These individuals often maintain possession of these items for long periods of time and keep their collections in numerous places – in digital devices in their homes, in their cars, in their workplaces, or on their persons.

b.    Individuals who have a sexual interest in children or images of children also may correspond with and/or meet others to share information and materials (including through digital distribution via the Internet); conceal such correspondence as they do their sexually explicit material; and

often maintain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography.  These individuals often maintain possession of these items for long periods of time.

8.    Digital child pornography on a digital device is easy to maintain for long periods of time.  Modern digital devices often have extremely large storage capacities.  Furthermore, cheap and readily available storage devices, such as thumb drives, external hard drives, and compact discs make it simple for individuals with a sexual interest in children to download child pornography from the Internet and save it – simply and securely – so it can be accessed or viewed indefinitely.

9.    Furthermore, even if a person deleted any images of child pornography that may have been possessed or distributed, there is still probable cause to believe that there will be evidence of the illegal activities – that is, the possession, receipt, and/or distribution of child pornography – at the SUBJECT PREMISES or on his person.  Based on my training and experience, as well as my conversations with digital forensic experts, I know that remnants of such files can be recovered months or years after they have been deleted from a computer device.  Evidence that child pornography files were downloaded and viewed can also be recovered, even after the files themselves have been deleted, using forensic tools.  Because remnants of the possession, distribution, and viewing of child pornography is recoverable after long periods of time, searching

the SUBJECT PREMISES could lead to evidence of the child exploitation offenses.

## VI. TRAINING & EXPERIENCE ON DIGITAL DEVICES[1]

10.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.  A person who connects to the Internet must use a computer or mobile device, such as a tablet or wireless telephone, to facilitate that access.  Furthermore, in my training and experience, these devices typically travel with a subject or remain in SUBJECT PREMISES.  It is therefore reasonable to believe that computers, tablets, wireless telephones, and other electronic storage media may be present in SUBJECT PREMISES.  Further, because it is possible to store certain mobile devices, such as removable storage media and wireless telephones, in a pocket, it is reasonable to believe that mobile devices may be found on the persons.

b.  Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally,

---

[1] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

      c.  Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

      d.  The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

16

e.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

f.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

g.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

h.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

17

11.   The search warrant requests authorization to use the biometric unlock features of the devices seized, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.   As noted above, I know that most homes with Internet capability use only one IP address.  That IP address, in turn, is often shared by many devices that access the Internet using a wireless modem.  Accordingly, if there are

multiple digital devices discovered during a search of the
SUBJECT PREMISES, any of those devices could have been used to
access the Internet and download the files discussed above.

d.   Thus, if while executing the warrant, law
enforcement personnel encounter a digital device within the
scope of the warrant that may be unlocked using one of the
aforementioned biometric features, the warrant I am applying for
would permit law enforcement personnel to, with respect to ANGEL
PADRON, who is located at the SUBJECT PREMISES during the
execution of the search: (1) depress the person's thumb- and/or
fingers on the device(s); and (2) hold the device(s) in front of
the face of the person with his or her eyes open to activate the
facial-, iris-, and/or retina-recognition feature.

12.   Other than what has been described herein, to my
knowledge, the United States has not attempted to obtain this
data by other means.

### VII. <u>SUMMARY OF PROBABLE CAUSE</u>

13.   From approximately March 2021 to July 2021, a 10-year-
old victim was enticed by Snapchat user "Whyyoublockm789", who
went by the screen name of "Daniel," into sending "Daniel"
multiple child pornography images of herself.

14.   On or about 11/17/2021, the mother of the 10-year-old
victim received text communication and an unanswered phone call
on her personal phone from a person who identified himself as
"Daniel" in the text. The phone call and text messages
originated from phone number (805) 825-9130.

19

15.   The FBI's investigation revealed that IP addresses associated with the Snapchat account "Whyyoublockm789" were subscribed to the SUBJECT PREMISES; and the phone number (805) 825-9130 was subscribed to ANGEL PADRON and the SUBJECT PREMISES.

16.   I have probable cause to believe that "Daniel" is ANGEL PADRON and that he is residing at the SUBJECT PREMISES and that there is probable cause to believe that evidence of the fruits and instrumentalities of the SUBJECT OFFENSES will be found at the SUBJECT PREMISES and on the person of ANGEL PADRON.

VIII.    **STATEMENT OF PROBABLE CAUSE**

17.   In preparing this application, I have spoken to FBI Special Agent Rodney Hyre, the FBI Case Agent, who told me the following:

**A.    Interview with Nicole Jackson and the Child Victim**

18.   On August 2, 2021, the FBI, Tampa Division, Orlando Resident Agency received a request to contact Nicole Jackson. Jackson was contacted by SA Hyre and SA Langer from the Orlando Resident Agency of the FBI on August 2, 2021. Jackson reported that she had discovered that her 10-year-old daughter had been in Snapchat communications with another user who went by the screen name of "Daniel" with the username of "Whyyoublockm789".[2]

---

[2] Snap, Inc. is a company located in Santa Monica, California that handles hundreds of millions of messages (also known as "snaps") every day through the application Snapchat. When messages or "snaps" are sent over the Snapchat network they are able to be opened and viewed by the recipient Snapchat user. Once the snap is opened, it remains viewable for a period of one to ten seconds (exact time is decided by the sender) before the
*(footnote cont'd on next page)*

Jackson reported that her daughter had saved her Snapchat communications with Daniel and that she had looked through her daughters Snapchat interactions with Daniel. Jackson reported that her daughter and Daniel engaged in extremely graphic sexual conversations. Jackson said that she saw videos that her daughter sent Daniel in which her daughter's vagina was visible. Jackson also reported seeing at least one video of a man masturbating his erect penis which Daniel had sent to her daughter. Jackson provided the FBI with permission to search her daughter's (hereinafter the "Child Victim") iPhone 8. Jackson said that the interaction between Daniel and her daughter apparently started in March 2021 and continued until July 30, 2021.

19. On August 2, 2021, FBI Forensic Examiner SA Alexis Brignoni made a digital copy of the iPhone 8. Brignoni also accessed the Child Victim's Snapchat communications with Daniel on the iPhone 8. Brignoni recorded the interactions via Snapchat which were accessed through the child victim's iPhone.

20. On September 2, 2021, the child victim was interviewed by Leslie Santos a FBI Child Adolescent Forensic Interviewer. During this interview the child victim affirmed that she had

---

snap is permanently deleted from the recipient's account. In this way, Snapchat users can send one-time, expiring messages to each other that contain photos and text. I know from my investigations that individuals with a sexual interest in children often use applications such as Snapchat for a number of reasons. One, Snapchat is often used by children. Two, it helps conceal illicit sexual conduct because of the nature of the disappearing messages. Three, there are minimal, if any, verification requirements which allows false online identities to be more easily created and maintained.

been in contact with a person she knew as Daniel on Snapchat.
The child victim estimated that she was in contact with Daniel
for approximately four months.  Daniel told the child victim
that he lived in California, was 16 years old and was Hispanic.
The child victim said that Daniel asked child victim for
multiple images and videos of the child victim in which her
vagina was visible, and she masturbated herself.  The child
victim said that Daniel would sometimes beg her for these
videos.  Daniel also sent multiple pictures and videos of his
penis to the child victim.  The child victim never saw Daniel's
face, but described his skin color as being the same as the
Child Adolescent Forensic Interviewer's, who is a Hispanic
female.

   **B.   The Review of Images Sent by Child Victim to Daniel
         Reveals Pornographic Images**

   21.  SA Hyre has observed numerous videos recovered from
the child victim's Snapchat conversations with Daniel. These
videos were sent from the child victim to Daniel.  Below are
three videos that SA Hyre believes, based on his training and
experience constitute child pornography.

         a.   Video 1.   Close up video showing the child
victim masturbating herself by rapidly inserting a pencil in and
out of her vagina.  Under the video the phrase "DANIEL SAVED A
SNAP IN CHAT" is written.

         b.   Video 2.  Video showing the child victim from
behind.  The child is naked and seen rubbing her vagina with her

hand.  Under the video the phrase "DANIEL SAVED A SNAP IN CHAT" is written.

      c.   Video 3. Video showing the child victim from the front. Video is a close up of the child's vagina. The child is seen masturbating herself with her fingers. Under the video the phrase "DANIEL SAVED A SNAP IN CHAT" is written.

      **C.    Information Obtained Snapchat**

    22.  On August 5, 2021, an administrative subpoena was served to Snapchat for subscriber information associated to the username Whyyoublockm789 for the period from March 19, 2021 to July 30, 2021.

    23.  On August 10, 2021, Snapchat provided the following information:

      a.   Creation I.P. :2600:8802:5700:94e:dc5d:948b:799a:e96a

      b.   Email: relefi5717@keinmail.com

      c.   Username: whyyoublockm789

      d.   Created: September 14, 2020 00:09:04 UTC

      e.   Several I.P. addresses were associated with this account including: 98.182.17.109 used on July 27, 2021 and July 28, 2021.

    24.  On September 8, 2021, a subpoena was issued to Cox Communication for subscriber information associated with the origination I.P. address 2600:8802:5700:94e:dc5d:948b:799a:e96a on September 14, 2020 at 00:09:04 UTC.

    25.  On October 14, 2021, Cox Communication responded to the subpoena, providing the following Subscriber Information:

      a.   Name: Manuel Padron

      b.   Home Phone: 805 825-9129

      c.   Work Phone: 805 539-8581

      d.   Address: 12 N Alisos St., Santa Barbara, CA 93103-3413 (i.e., the SUBJECT PREMISES)

      e.   ICOMS ID: 342043390509

26.  On October 21, 2021, a subpoena was issued to Cox communication for subscriber information associated with I.P. address 98.182.17.109 used on July 27, 2021 and July 28, 2021.

27.  On November 18, 2021, Cox communication responded to the subpoena, providing the following Subscriber Information:

      a.   Name: Manuel Padron

      b.   Home Phone: 805 825-9129

      c.   Work Phone: 805 539-8581

      d.   Address 12 N Alisos St., Santa Barbara, Ca 93103-3413 (i.e., the SUBJECT PREMISES)

      e.   ICOMS ID 342043390509

28.  An FBI search revealed that the telephone number 805-539-8581 listed as the work phone in the Cox Communication return resolved to; User Name: angel_patron; Display Name: Angel Padron.

29.  A California Department of Motor Vehicles search revealed that Angel Eduardo Padron, DOB 01/03/1997, resides at 12 N Alisos St., Santa Barbara, CA 93103 (the SUBJECT PREMISES).

30.  A Lexis Nexis search revealed this same person lived at the address as well as Manuel J Padron.  A California Department of Motor Vehicles search revealed that Manuel J

Herrera Padron, DOB 12/24/1968, resides at 12 N Alisos St.,
Santa Barbara, CA 93103 (i.e., the SUBJECT PREMISES). Based on
the common last name and the age difference, I believe that
ANGEL PADRON is the son (or another relation, such as a nephew)
of Manuel Padron.

  **D.   Phone Call and Text Message from Daniel**

  31.  On November 17, 2021, the mother of the child victim
contacted the FBI to report that she had received text
communication and an unanswered phone call on her personal phone
from a person who identified himself as "Daniel" in the text.
Both the phone call and the text emanated from the phone number
(805) 825-9130.

  32.  The child victim's mother reported that she had
previously contacted "Daniel" using her phone in July 2021. The
child victim's mother contacted "Daniel" after finding sexually
charged communications between "Daniel" and the child victim on
the child victim's phone in her Snapchat account. During this
communication the child victim's mother informed "Daniel" that
her daughter was ten years of age and that she was directing him
to stop talking to her.

  33.   The Child Victim's mother provided a copy of the
text exchange to the FBI. The message exchange is as follows:

    a.   (805) 825-9130: Hey

    b.   (805) 825-9130: Hello?

    c.   CV'S Mother:  Who is this

    d.   (805) 825-9130: Is this bri?

e. CV'S Mother: Sorry this is bri mom she's outside Ill tell her to text you when she comes home

f. (805) 825-9130: okay thanks alott

g. CV'S Mother: Hello who this

h. (805) 825-9130: Is this bri?

i. CV'S Mother: Yes

j. (805) 825-9130: oh hi it's uh me Daniel

**E.  Billing Information on the Phone Number Used by Daniel Traces back to the SUBJECT PREMISES**

34.  On November 30, 2021, The FBI served a subpoena to T-Mobile USA, Inc. for subscriber information associated with telephone number (805) 825-9130, from November 1, 2021 through November 17, 2021.  This was the phone number utilized by "Daniel," as previously described.

35.  On November 30, 2021, T-Mobile responded to the subpoena providing the following information:

a. Customer Name: Angel Padron

b. Subscriber Name: Angel Padron

c. Service Address: 12 N ALISOS St., SANTA BARBARA, CA 93103 (i.e., the SUBJECT PREMISES)

d. Billing Address: 12 N ALISOS St., SANTA BARBARA, CA 93103 (i.e., the SUBJECT PREMISES)

**F.  The SUBJECT PREMISES**

36.  I have conducted surveillance of the SUBJECT PREMISES; and the description of the  SUBJECT PREMISES is contained in Attachment A-1.

37.   For all of these reasons, I have probable cause to believe that "Daniel" is ANGEL PADRON and that he is residing at the SUBJECT PREMISES and that there is probable cause to believe that evidence of the fruits and instrumentalities of the SUBJECT OFFENSES will be found at the SUBJECT PREMISES and on the person of ANGEL PADRON.

## IX. <u>REQUEST FOR SEALING</u>

38.   It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant affidavit.  I believe that sealing is necessary because the items and information to be seized is relevant to an ongoing investigation into criminal conduct involving minor victims and as far as I am aware, the targets of this investigation remain unaware that they are being investigated.  Disclosure of the search warrant affidavit at this time would seriously jeopardize the investigation, as such disclosure may provide an opportunity to destroy evidence, change patterns of behavior, or allow flight from prosecution. Further, based upon my training and experience, I have learned that online criminals often search for criminal affidavits and search warrants via the Internet, and disseminate them to other online criminals as they deem appropriate, i.e., post them publicly online through forums.  Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on this continuing investigation and may severely jeopardize its effectiveness

## X. <u>CONCLUSION</u>

39.   For all the reasons described above, there is probable cause to believe that evidence, fruits, and instrumentalities of violations of the Subject Offenses, as described in Attachments B-1 and B-2 of this affidavit, will be found in a search of the SUBJECT PREMISES, as described in Attachment A-1, and on the person of ANGEL PADRON, as described in Attachment A-2.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this _____ day of
_____, 2020.


_____
UNITED STATES MAGISTRATE JUDGE

28